## NELSON & HATCH v. DUNN.

1. When upon the purchase of a plantation and slaves, on credit, a number of notes are executed, falling due during a series of years, if the maker discharges, or pays the notes first falling due, to the payee, he will be presumed to have availed himself of any payment, or off set, which then existed, and will not be permitted to make such a defence against an assignee of notes subsequently falling due.

2. If the notes so paid off by the maker, were assigned previous to payment, it was his duty to make the fact appear. Such assignment cannot be inferred from the declaration of the maker at the time of the execution of the notes, that he intended to transfer them.

Error to the Circuit Court of Sumter. Before the Hon. S. Chapman.

THE defendant in error declared against the plaintiffs, on a promissory note, dated — day of June, 1840, for six thousand dollars, due the 1st of May, 1844, made by defendants, payable to the order of A. Henderson, and by him indorsed to the plaintiff below. At the fall term of the circuit court, a trial was had, and a verdict returned for the plaintiff, for the amount of the note and interest. Thereupon judgment was rendered. During the trial, the presiding judge sealed a bill of exceptions, which presents the following facts : It was shown by defendants, that in June, 1840, Nelson & Hatch purchased of Alexander Henderson, the payee of the note, a tract of land and about ninety slaves, together with the stock, farming utensils, &c., for which they executed ten notes, one due May, 1841, for $5000, one due the first of May, 1842, for $6000, one in May, 1843, and one in May, 1844, being the note sued on, for $6000; one falling due on the first of May, each year, for $6000, until the year 1850, and the note of that year being for $7000, and the last note, falling due 1851, for $21000, to secure the payment of which, Nelson & Hatch executed a deed of trust on the property purchased of Henderson. The deeds of conveyance from Henderson to Hatch and Nelson, were proved, and the deed of trust by Nelson & Hatch to Henderson. The witness stated, that the value of the slaves were estimated by him, at the request of the vendor and vendees. That he wrote down the name of each as they passed before him, and also the estimated value of each. That the value of the slaves was affixed by him, upon the supposition that they were sound, except two slaves ; that the vendor and vendees afterwards, in closing the contract, made some alteration in the value attached to some of the slaves, Henderson objecting that some had been priced too low, and Nelson & Hatch that some had been priced too high; but witness did not remember what particular alteration had been made. Henderson, the vendor, gave no information to the vendees, that any of the slaves were unsound, except the two referred to. That Hatch resided about three miles from the plantation, and Nelson about fifty, and had been on terms of intimacy with Henderson.

It was also proved, that four of the slaves priced by Garrett, the witness, as sound, at the time of the sale, and a long time previous, were unsound, with incurable diseases, which could not be discovered by external observation, and that said slaves presented the appearance of being sound. That the value of said four slaves was impaired by reason of their disease, to the amount of $1200, and the evidence conduced to show, that at the time of the sale, the vendor knew they were diseased. It was also shown, that one Hatch, the brother of one of the vendees, was then, and had been, the overseer of Henderson, and was present at the sale. Also, Dr. Dalton, the son-in-law of Henderson, who had had said four slaves under his care, came up during the time the trade was going on, but it did not appear that the vendees had any conversation with them about the slaves. That Henderson was a partner in a commission house in Mobile, where he spent most of his time, but visited his plantation occasionally.

The defendants also proved, that the property purchased by them of Henderson, was all he had in Alabama. That at the time of the sale, Henderson did not think he was insolvent, but it turned out that he was, and so continued till his death. That at the time of the sale, Nelson, one of the defendants, and one Chalmers, were the securities of Henderson to one Physic, on a note for $3339 25, dated 5th July, 1839, with interest from date. That Nelson was then sued on this note,[1] in the county of Greene, and on receiving the above mentioned notes of Nelson & Hatch, for the purchase money of the property, Henderson remarked, he should transfer the notes in payment of his debts, and that Nelson & Hatch might consider them as transferred; when Nelson remarked, I am now sued as your security on the Physic debt, and you have made no arrangement for its payment. Henderson replied, I wish you to defend the suit, and keep off the collection as long as you can, and when judgment is recovered against you, you shall be protected out of some one of the notes, falling due about that time. Some conversation took place as to how long the debt could be postponed. It was supposed the suit then pending, could be defeated, and that it would take from two to three years before the

judgment would be obtained. The suit then pending was defeated, another suit on the debt instituted against Nelson, judgment obtained in the fall of 1841, and he was compelled to pay on the execution, in March, 1842, $4231 96. The defendants also proved, that they had paid the two first notes by producing and identifying them, viz: those falling due in 1841 and 1842. That the third note was assigned to secure some creditors of Henderson in North Carolina, and was sued upon, but when it was assigned did not appear. That the note sued on, and the three next falling due, were assigned to the plaintiff for the purpose of collection, and when collected to be applied to the payment of certain enumerated debts, *pari passu*, named in the instrument of assignment, and amongst which debts was named the Physic debt, that Nelson was sued on as security for Henderson, and had to pay as stated. This assignment was made by deed, and bears date October the first, 1840. The plaintiff at the same time gave a receipt to Henderson for the notes, specifying he had received them for collection, and when collected, the proceeds to be paid to the creditors named in the deed of assignment, *pari passu*, and without preference. It was also shown, that in the latter part of the winter of 1840, or the spring of 1841, Nelson & Hatch were notified of the assignment above referred to, of these four notes to plaintiff. There was evidence that Henderson hired of Nelson & Hatch two horses and two servants, to make a trip to North Carolina, in June, 1840, with an agreement that if they were not returned, Henderson would pay their value. That he kept them four or five months, their hire being worth $30 per month. That he never returned the horses, but in the fall agreed that the value of one horse was $90, the value of the other, $75. It was also shown, that in 1842 he hired two other servants of defendants, for about three months, and that their hire was worth about $31 per month. It was also shown, that one Stone held a note on Henderson, and being about to arrest him, on the 6th March, 1841, he drew a draft on the defendants for $835 92, in favor of Stone, which the defendants accepted, due the 15th January, 1842, and at maturity it was taken up by the defendants drawing on their commission merchant in Mobile, which last was paid out of their

own funds. It was also in proof, that of all the foregoing defences the plaintiff was notified before the trial, in writing, which was accepted as a notice of off sets. It was also shown, that the defendants had taken up, or had transferred to them, several of the debts intended to be secured by the deed of assignment of the notes transferred to Dunn, as stated.

The court charged the jury, that the evidence was insufficient to prevent a recovery on the note sued on, to which charge the defendants excepted, and here assign for error, the charge given on the evidence, as shown by the bill of exceptions.

ORMOND and SMITH, for the plaintiff in error, made the following points:

1. The assignment to Dunn is a mere naked power, and whether he is considered as an assignee under the statute, or as the assignee of a *chose in action* at common law, he occupies the same condition as his assignor.   Walker v. Miller, 11 Ala. 1083 ; Bank of Mobile v. Hall, 6 Id. 639 ; Hale v. Jackson, 20 Pick. 194 ; Brooks v. Marbury, 11 Wheat. 78 ; Story on Agency, 507.

2. The agreement between Henderson and Nelson & Hatch, at the time of the execution of the notes, in regard to the Physic debt, for which Nelson was bound as surety, created an equity in favor of Nelson, which attached to the debt, and will follow it in the hands of the assignee.   Smith v. Pettus, 1 S. & P. 107 ; Andrews & Brothers v. McCoy, 8 Ala. 929 ; Norton v. Rose, 2 Wash. Rep. 234 ; Murray & Winter v. Lebburn, 2 Johns. C. 441 ; Livingston v. Dean, Id. 479.

3. The omission of Henderson to disclose the unsoundness of the four female slaves, was a fraud which may be relied on in the reduction of the damages, as the plaintiff has no other rights than Henderson would have were he prosecuting this suit in his own name, and the same is true of the off sets.

4. They contended that the plaintiffs in error had the right to make these defences against any of these notes, as the defence is not to any particular note, but to the entire contract evidenced by all the notes.

5. In reply to the authorities cited from 12 Wendell, 356, and 6 Dana, 223, they insisted they were not analagous because it was not shown that the two first notes taken up by Nelson & Hatch, were paid to Henderson, and the inference from the whole record is, that they were assigned by Henderson, as he was insolvent, and all the rest of the notes were proved to have been assigned.

6. Lastly, they contended, that this record must not be considered as if the plaintiffs in error had demurred to the evidence in the court below, and thereby subjected themselves to all the inferences which the jury might make, but that the precise converse of this proposition was the true rule in this case, as the act of the court in withdrawing the case from the jury, could only be justified upon the hypothesis of a demurrer by the plaintiff to the evidence. That as the record did not state that the two first notes were paid by Nelson & Hatch to Henderson, this court could not infer the existence of such a fact, which, if it existed, and was important to the plaintiffs, should have been shown by them. That in thus drawing inferences from the record, the appellate court would necessarily encounter the hazard of deciding the cause upon a point not made in the court below, considered of no importance by either party, and therefore imperfectly stated upon the record.

HOPKINS and MANNING, for defendants.

1. There is no warranty, or false representations; the vendees could have inquired for themselves—and even if the evidence tended to show, that Henderson knew of the unsoundness of the slaves, he was not bound to communicate it. 2 Ala. R. 151; 3 Ib. 357; 17 Mass. 267.

2. The defence of the failure of consideration cannot be made at law. There was an entire sum given for the land and negroes. The sum was divided into eleven notes, falling due, one annually, and consequently this partial failure of consideration diffused through each note, and in proportion to the amount of each, and it would require eleven trials to ascertain the amount of the failure of consideration.

3. If this failure of consideration could be pleaded at law, the defendants were bound to adjust it with Henderson, on

the two first notes, and it would be inequitable to permit them to pay them to Henderson in full, after notice of the transfer to Dunn, and then permit them to rely on this defence to the notes in plaintiff's hands. 5 Johns. Ch. R. 235; 9 Cowen, 403; 1 Ran. 466. And the same rule should apply to the sets off. 12 Wend. 356; 6 Dana, 223.

4. The presumption of law is, that all those demands, by way of sets off and failure of consideration, have been compensated and satisfied in the settlement of the two first notes that were produced by the defendants, and paid by them, as they now contend. And taking all the facts to be true, as stated by the proof, the charge of the court was correct.

DARGAN, J.—It is necessary to ascertain, in the first place, the nature of the title of the plaintiff, to the note declared on, as that will aid us in coming to a correct conclusion, whether any of the defences relied on should have been allowed. Henderson, the payee of the note, sold to the plaintiffs in error, in June, 1840, a plantation and about ninety slaves, stock, farming utensils, &c. They executed to him eleven promissory notes, the first falling due the first of May, 1841, and was for $5,000; one falling due on the first of May of each year afterwards, each for $6,000, except the two last notes—one of these was for seven, and the other for $21,000. The notes due the first of May, 1844, 1845, 1846, and 1847, were assigned to the plaintiff, by Henderson on the first day of October, 1840, by deed, for the purpose of securing certain debts named in the deed of assignment—the plaintiff at the same time, giving Henderson a receipt for them, by which he undertakes to collect the notes, and apply the proceeds in the manner specified in the deed. The notes were also indorsed by Henderson to the plaintiff, but nothing passed from Dunn to Henderson, except the receipt, which was merely an undertaking to collect the notes, for the purposes indicated in the deed of assignment.

In what condition, then, does Dunn hold the notes, or what is the nature of his title? He is not a *bona fide* holder for value, in the mercantile sense of that term, for he has parted with nothing of value; he has paid nothing for them,

34

and it is now well settled, that the holder of a note, merely as security for the payment of a debt of the maker, is not a *bona fide* holder according to the meaning of that term in the law merchant. But that such a holder takes the note, or bill, subject to all equities existing against it, at the time he receives it, see 6 Ala. Rep. 634, and the cases there cited.

But the law permits a debtor to dispose of his property, with the view, and for the purpose of securing the payment of his debts, and when once he has so appropriated his property, the rights of his creditors intended to be secured thereby, attach upon it, and if it is conveyed to a trustee, who assents to the conveyance, and by virtue thereof takes possession of the property, can such a trustee be said to be a mere holder without consideration? What is the consideration of such a conveyance? It is to secure the payment of the debts of the grantor, and the trustee assenting to it, undertakes to perform his duties according to the terms of the deed. Such a conveyance cannot be said to be without consideration, but is founded on such a consideration as the law deems valuable; and the deed will be sustained for the purposes for which it is intended. As the law will sustain such a deed, and will coerce the trustee to perform the obligations he has assumed, the title to the property passes from the grantor for a lawful purpose, and on a consideration that will support the deed; and therefore the vendor cannot revoke the deed, nor reclaim the property, unless by paying the debts secured by it. The conveyance, then, to Dunn, and the indorsement of the notes, gave him a title to the notes, that could not be defeated by Henderson.

Nor could the defendants prevent Henderson from making such a disposition of the notes, nor defeat the transfer, by obtaining other offsets against Henderson, after notice thereof was given them. Dunn therefore holds the legal title to the notes, for a legal purpose, which purpose, neither Henderson nor the defendants can defeat.

We will now proceed to the defence relied on. First is an offset for the hire of horses, and two servants, in the year 1840. The horses were not returned, and their value was agreed on—the amount of this offset being something like $250. The next is, that four of the female slaves were un-

Nelson & Hatch v. Dunn.

sound, and their value diminished thereby $1,200. The next is a debt that Henderson owed to Physic, on which Nelson was security, and which he was compelled to pay— this amounts to $4,231 95. This was paid in March, 1842, by Nelson, but the obligation of Nelson to pay existed before the notes were assigned, or before they were given. It was also shown that Henderson drew a draft on defendants for $835 92, in March, 1841, payable in January, 1842, which they accepted and paid at maturity. These counter claims, or demands against Henderson, amounting to about $6,500, the defendants say, they can assert against the note sued on, in the hands of the plaintiff, first by virtue of our statute, which allows them to assert all offsets, payments, or discounts, against the assignee of a note, (not negotiable in bank,) which they had against the payee before notice of the assignment; and they also say that the nature of Dunn's title to the notes, is such, that they could assert those claims against Dunn, even by the law merchant, as he is not a *bona fide* holder of the notes in the legal, mercantile sense of that term. If there should be found no controlling principle of law that prohibited the defendants from interposing these claims by way of offsets, or abatement of the note, I should fully assent to both these propositions, unless indeed there be some of the claims, which could not be asserted against Henderson. But the evidence presents also these facts: the defendants produced in court as paid, the two first notes, the one due in May, 1841, and the one in May, 1842, which amount in the aggregate to $11,000. To whom they were paid does not appear, nor does it appear they were ever assigned. The third note is not paid, but is assigned for the purpose of securing other creditors. It also appears, that the defendants had notice of the assignment, before the first note fell due, and that Henderson in fact was insolvent at the time of the giving of the notes, and died insolvent, and the plaintiff says, that under these circumstances, the defendants ought not to be allowed to assert these counter claims against this note. That they had notice of the transfer, before they paid any money to Henderson. That they paid the two first notes without asserting those claims against him, (if indeed those claims have not been already compensated, or allowed

in the payment of those two notes,) and that it would be in-
equitable, and unjust, to permit them to insist on these claims
now, as offsets to this note.   In the case of Callers & Wins-
low v. Allen, 12 Wend. 355, it was said that where two notes
are held against one man, and he has a demand against the
payee, sufficient to extinguish one note, and the payee trans-
fers one note, and retains the other, that this demand held by
the payor against the payee, cannot be asserted against the
holder, although he has received the note after due, and
therefore he held it subject to all the equities existing against
the note at the time of the transfer.   So in 6 Dana, 223, it
was held, that where a party has given several obligations,
some of which are held by an assignee, and some by the
payee, and the debtor has an offset against the payee, that
he shall not assert his offset against the assignee, in the ab-
sence of proof that there was any agreement that his demand
should be an offset against the note or obligation assigned,
whilst the obligee or payee holds a debt against him equal
to the offset.

If these authorities are just expositions of the law, of
course it would follow, that if the debtor, after notice of the
assignment, pay the payee in full, and neglect to have his
offset adjusted, he could not be permitted to assert that offset
against the assignee.   These authorities appear to me to be
just; they are in unison with the maxim, *sic utere tuo, ut
alienum non lœdas.*   Here Henderson had assigned the four
notes falling due May, 1844, 1845, 1846, 1847, for $6,000
each—they are insufficient to pay in full the notes intended
by them to be secured; the defendants knew they were as-
signed to pay those debts named in the deed; they had the
legal right to have their claims or offsets adjusted, and paid
in the settlement of the two first notes held by Henderson.
They waive their legal right, and now wish to assert this
right to the prejudice of the creditors, who have no other
fund to look to for payment, and who have not been guilty
of any negligence.   I do not think they ought to be permit-
ted.   If the demands have not been compensated, they now
attempt to use as offsets, it has been either from negligence
to their own interest, or from a waiver of their rights against
Henderson in the settlement of the two first notes, and cer-

tainly it is not unjust to make them bear the consequences of their own act, or omission. Nor can the fact that they have purchased some of the debts secured by the deed to Dunn, enable them to plead these debts as offsets. The deed contemplates, that the debts named in it should be paid from the proceeds of the notes *pari passu*, and without preference; but to permit the defendants to buy up part of the debts secured by the deed, and to have the whole allowed as offsets to the notes conveyed, would be, to give the debts obtained by the defendants, a preference over the others, and thereby to change the terms of the deed, or to defeat one of its objects—that is, the debts intended to be secured by it, should be paid *pari passu*, and without preference. The defendants cannot gain a preference by buying up the debts, to pay which the notes were assigned.

The charge of the court was, that the evidence was insufficient to prevent a recovery on the note. Under this charge, if by possibility the jury could have allowed any one of the debts, here attempted to be asserted as offsets, in accordance with the rules of law, as here laid down; or if there was the slightest conflict in the testimony, the cause would be reversed. But not one of those claims should have been allowed as offsets; there is no conflict of testimony, unless it could be said to exist as to the unsoundness of the four slaves, and this case is decided, as if the defendants had the right to claim the abatement of $1,200 against Henderson; therefore the judgment of the circuit court cannot be reversed. The propriety of this course is fully shown by the case of Simms v. Simms, 2 Ala. Rep. 117, and the case of Ralston v. Cullum & Smith, decided at the last term of this court, and Swift v. Fitzhugh, 9 Porter.

The judgment is affirmed.

COLLIER, C. J.—I concur in the conclusions expressed in the opinion of my brother Dargan, and beg leave to subjoin a remark or two. It cannot be inferred from the declaration of Henderson at the time the notes were delivered to him, that *he intended to transfer them, and that the makers might consider them as already transferred*, that he did in fact dispose of his right to them. An expressed intention to

do an act, in the absence of all evidence that it was done, certainly does not prove that the purpose of the declarant was consummated. He may have taken advantage of the *locus pœnitentiœ*, as it was allowable to do; and it is too much for any tribunal, where the inquiry becomes material, to assume that he did not.

It is explicitly stated that the two notes which first matured, were payable to the *order* of Henderson, and were produced by the defendant as *evidence* of their having been paid. Upon this statement, it cannot be inferred that the notes were indorsed or otherwise transferred by the payee. If they had not been indorsed, the intendment would be that they were paid to Henderson, in the absence of all proof on the point.

Uninfluenced by our statute, it may perhaps be conceded that a check or note payable to a certain person *eo nomine* or bearer, is not evidence *per se* of payment to the person whose name is inserted; because such a paper on its face would be payable to any person who might become its proprietor. If the note in question was ordered *to be paid to* some third person, either by a written or verbal transfer, or was in fact paid to some one else than the payee, it should have been proved. 7 Sergt. & R. Rep. 124 to 126.

Although, it is generally most proper to instruct the jury hypothetically upon the facts, I cannot think the evidence was so contradictory as to make the sweeping charge that was given erroneous. If the evidence had been demurred to by the plaintiff, it could not have been presumed in the absence of, if not against proof, that the notes which the defendants paid, had been transferred by the payee. Whether this was deemed an important inquiry in the primary court in the present posture of the case, can have no influence in determining what judgment we should pronounce. We must look at the record as it is presented to us, and from the disclosures there made, we must form an opinion whether the ruling of the circuit court should be *supported*.

Considering the agreement in respect to what has been

called the "Physic debt," however the law may be on a demurrer to evidence, I think a jury might very well infer that it had been deducted against one of the notes maturing about the time that Nelson paid it.

If what I have said be maintainable, the cases cited in the opinion of the court from 12th Wendell and 6th Dana are directly in point. I may add, that these cases rest upon a principle which has been too often recognized to be successfully combatted. See also Taylor's adm'rs, et al. v. Spindle, 2 Grattan's Rep. 44.